1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

CAROL LYNN PAK-WALKER,

11

Plaintiff,

12

v.

13

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

14
15

Defendant.

16

CASE NO. 3:16-cv-05286 JRC

ORDER ON PLAINTIFF'S
COMPLAINT

17
18
19
20

This Court has jurisdiction pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and
Local Magistrate Judge Rule MJR 13 (*see also* Notice of Initial Assignment to a U.S.
Magistrate Judge and Consent Form, Dkt. 5; Consent to Proceed Before a United States
Magistrate Judge, Dkt. 6). This matter has been fully briefed (*see* Dkt.17, 18, 19).

21
22
23
24

After considering and reviewing the record, the Court concludes that the ALJ did
not commit harmful legal error when evaluating plaintiff's Social Security application.
For example, the ALJ noted various inconsistencies between plaintiff's various

statements, as well as inconsistency between plaintiff's statements and the objective

medical evidence, and inconsistency between plaintiff's allegations and her demonstrated

performance. For example, on April 28, 2010, plaintiff "claimed that Lyrica had caused

her to gain 30 pounds and did not make her feel much better" (AR. 1036), but on

February 21, 2012, plaintiff "told Dr. Lundin that Lyrica had helped significantly, but

was not covered by her current health plan" (AR. 2664). Limitations alleviated by

medication do not need to be included in a claimant's residual functional capacity

("RFC").

Similarly, when plaintiff tested positive for PCP, she told the doctor that she was

drugged at a party (AR. 2680). However, when she subsequently testified under oath at

her administrative hearing, she claimed that when she had tested positive for PCP, she did

not even know what PCP was (AR. 48 ("I looked at them and said, what is PCP? And I

didn't know what they were talking about")). The ALJ's finding that plaintiff's "use of

illicit substances may explain her erratic, tangential, and hysterical presentations" is

based on substantial evidence and is properly considered as it is relevant to determination

of which of plaintiff's potential limitations actually result from impairments (AR. 1207).

Difficulties arising from the occasional use of illicit substances do not need to be

included in a claimant's RFC.

Furthermore, the record demonstrates that plaintiff's impairments did not meet or

equal a Listed Impairment, as, for example, despite alleging marked social limitations,

plaintiff elsewhere indicated that she was a "comfort provider" for her friends and family

and that she got along "very well!" with authority figures (AR. 223, 227).

1    Therefore, this matter is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

2                                    BACKGROUND

3    Plaintiff, CAROL LYNN PAK-WALKER, was born in 1973 and was 32 years old

4    on the alleged date of disability onset of July 6, 2005 (*see* AR. 126-29, 130-35, 137-43).

5    Plaintiff completed two years of general studies in college (AR. 1261-62)  Plaintiff last

6    worked in a daycare but quit after three days allegedly because she physically could not

7    handle it (AR. 1263-64).

8    According to the ALJ, plaintiff has at least the severe impairments of "cervical

9    degenerative disc disease, lumbar degenerative disc disease, affective disorder, anxiety

10   disorder, personality disorder, fibromyalgia, substance use disorder (marijuana), and

11   asthma (20 CFR 416.920(c))" (AR. 1168).

12

13                               PROCEDURAL HISTORY

14   Plaintiff provides an uncontested procedural history in her Opening Brief (*see* Dkt.

15   17, pp. 2-3).  Plaintiff's application for Supplemental Security Income ("SSI") benefits

16   pursuant to 42 U.S.C. § 1382(a) (Title XVI) of the Social Security Act was denied

17   initially and following reconsideration (*see* AR. 1166). After an unsuccessful appeal to

18   the Appeals Council, a successful appeal to the District Court, and a remand from the

19   Court, plaintiff's latest hearing was held before Administrative Law Judge Joanne E.

20   Dantonio ("the ALJ") on February 9, 2015 (*see id.*; AR. 1256-1305). On June 10, 2015,

21   the ALJ issued a written decision in which the ALJ concluded that plaintiff was not

22   disabled pursuant to the Social Security Act (*see* AR. 1163-1228).

23

24

In plaintiff's Opening Brief, plaintiff raises the following issues:   (1) Did the Commissioner err in determining plaintiff's severe impairments; (2) Did the Commissioner err in determining that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the Listed Impairments; (3) Did the Commissioner err in evaluating plaintiff's credibility; (4) Did the Commissioner err in determining plaintiff's residual functional capacity; (5) Did the Commissioner err in dismissing the testimony of the vocational expert; and (6) Did the Commissioner err by relying on insufficient medical evidence (*see* Dkt. 17, p. 2).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)).

## DISCUSSION

(1)     **Did the Commissioner err in determining plaintiff's severe impairments**?

Plaintiff contends in her opening brief that the ALJ erred in failing to conclude that plaintiff's arthritis is a severe impairment (*see* Dkt. 17, pp. 6-7). However, defendant counters that plaintiff "does not cite to evidence that establishes the existence of the alleged arthritis, let alone that the condition was a severe impairment," noting a lack of a diagnosis for arthritis by an acceptable medical source based on objective findings (*see*

Dkt. 18, pp. 3-4). Plaintiff appears to have conceded this argument as she offers no reply to defendant's assertions, and instead provides a revised list of issues in her reply brief, wherein this issue is eliminated and the issues are limited to two issues only (*see* Dkt. 19, p. 2).

Nevertheless, since plaintiff initially raised the issue, the Court offers the following brief analysis.

Step-two of the administration's evaluation process requires the ALJ to determine if the claimant "has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citation omitted); 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (1996). The Court notes that plaintiff bears the burden to establish by a preponderance of the evidence the existence of a severe impairment that prevented performance of substantial gainful activity and that this impairment lasted for at least twelve continuous months.  20 C.F.R. §§ 404.1505(a), 404.1512(a) and (c), 416.905(a), 416.912(a) and (c); *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)); *see also Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) (citing *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995)).

Plaintiff did not respond to defendant's argument and did not direct the Court to sufficient evidence establishing the severity of plaintiff's alleged impairment of arthritis. For the reasons stated and based on the record as a whole, the Court concludes that plaintiff has failed to meet her burden to establish that arthritis is a severe impairment.

(2)   **Did the Commissioner err in determining that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the Listed Impairments?**

In her opening brief, plaintiff contends that the ALJ erred both by failing to conclude that plaintiff met or equaled the Listing for Disorders of the Spine (Listing 1.04) and by failing to conclude that plaintiff met or equaled a Listing due to her mental health impairments (*see* Dkt. 17, pp. 7-9). However, plaintiff offers no reply to defendant's argument that plaintiff "makes no specific argument regarding how her conditions equaled the requirements of this Listing [Disorders of the Spine]; her bare contention that she does therefore fails," noting that plaintiff failed to cite evidence establishing nerve root compression and noting that plaintiff "does not, moreover, even allege her condition caused sensory or reflex loss" (Dkt. 18, pp. 5-6 (citing Dkt. 17, pp. 7-8)).

At step-three of the administrative process, if the administration finds that the claimant has an impairment(s) that has lasted or can be expected to last for not less than twelve months and is included in Appendix 1 of the Listings of Impairments, or is equal to a Listed Impairment, the claimant will be considered disabled without considering age, education and work experience.  20 C.F.R. § 404.1520(d).   The claimant bears the burden of proof regarding whether or not she "has an impairment that meets or equals the criteria of an impairment listed" in 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings"). *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005), *as modified to render a published opinion by* 2005 U.S. App. LEXIS 3756 (9th Cir. 2005).

Regarding Disorders of the Spine, the Court notes the description of this Listing as follows:

**Listing 1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), <u>resulting in compromise of a nerve root</u> (including the cauda equine) or the spinal cord. With:

>   a.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, <u>motor loss</u> (atrophy with associated muscle weakness or muscle weakness) <u>accompanied by sensory or reflex loss</u> and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>   b.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or  . . .
>   c.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, 104A (emphases added).

       As noted by defendant, plaintiff has not demonstrated compromise of a nerve root, and multiple aspects of the treatment record demonstrate the lack of any such evidence (*see, e.g.*, AR. 2607 ("I reviewed the patient's host of imaging studies, [which] included multiple MRIs and multiple CT scans of the entire nervous system and spine  . . . . [And] no evidence of nerve root impingement or spinal stenosis is seen"), 2705). Similarly, the Court notes that the ALJ provided an extremely thorough discussion of the medical evidence, which repeatedly documents consistent lack of motor loss accompanied by sensory or reflex loss (*see* AR. 1174-1200; *see also, e.g.,* AR. 270 ("she has excellent strength throughout the upper extremities with equal and symmetric reflexes"), 278 ("Motor Strength: Hip flexors, hamstrings, quadriceps, foot dorsiflexors and plantar flexors and great toe extensors are all 5/5"), 396 ("Reflexes 3+ symmetric BLE. Gross sensation intact BLE"), 407 ("She has 5/5 strength to all major muscle groups initially with giving way due to subjective pain"), 449 ("[normal] strength in

sensation in all extremities"), 1675 ("cervical spine showed no weakness"), 1693 ("a

straight leg raising test was negative  . . . .  No quadriceps weakness, no weakness of

the hamstring muscles, no ankle weakness was observed, no paralysis was noted"), 2395

("strength is 5/5 X 4 extremities"), 2476 ("5/5 power in the deltoids, biceps, wrist

extensors, triceps, hand intrinsics, quadriceps, hamstrings, dorsiflexors, extensor hallucis

longus and plantar flexors bilaterally" with intact sensation and normoactive reflexes),

2607 ("5/5 power in the deltoids, biceps, wrist extensors, triceps, hand intrinsics,

quadriceps, hamstrings, dorsiflexors, extensor hallucis longus, and plantar flexors

bilaterally [with] sensation [being] intact to light touch and joint position sense in the

upper and lower extremities" and reflexes: "brisk, 3/4"), 2795 (intact sensation and

reflexes), 2819 (intact sensation and normal reflexes)). As noted by defendant, plaintiff

does not direct the Court to evidence of spinal arachnoiditis or lumbar spinal stenosis

resulting in pseudoclaudication.

For the reasons stated and based on the record as a whole, Court concludes that the

ALJ did not err by failing to conclude that plaintiff's back impairments met or equaled

the severity of a Listed Impairment.

As noted, plaintiff also argues that her mental impairments meet or equal a Listed

Impairment, noting that in order to "satisfy the Paragraph B criteria, the mental

impairments must result in at least two of the following: marked restriction of activities

of daily living; marked difficulties in maintaining social functioning; marked difficulties

in maintaining concentration, persistence, or pace; or repeated episodes of

decompensation, each of extended duration" (Dkt. 17, p. 8 (citing 20 C.F.R. § 404.

1520a)). First, the Court notes that plaintiff argues that her mental health impairments have resulted in marked limitations in social functioning and activities of daily living, but cites only to her own testimony in support of this assertion (*see id.* (citing AR. 352, 1283-86, 1293)). The ALJ failed to credit fully plaintiff's allegations regarding her limitations, and, as discussed subsequently in this Order, the Court affirms such finding, *see infra*, section 3.

Furthermore, the Court concludes that the ALJ's finding that plaintiff suffers from moderate limitations in her social functioning and activities of daily living are based on substantial evidence in the record as a whole. For example, regarding social functioning, the ALJ noted the following:

> In her function report, she reported that she shopped in stores usually with help and talked regularly on the phone with others. She tried to attend church but usually stayed home as the service involves too much standing. She did not claim any difficulty handling the social aspects of shopping or church. The claimant asserted difficulty getting along with family, but indicated no trouble getting along with friends, neighbors, or others. She got along 'fine' with authority figures. In October 2012, the claimant testified that she went shopping with her boyfriend and visited a friend 1 to 2 times a month when in town. Unless having a bad day, she talks to 4 good friends daily. These examples and the medical evidence of record as a whole, as discussed in this decision, establish no more than moderate limitation in this domain of functioning.

(AR. 1171 (internal citation to AR 184)).

The Court concludes that these findings by the ALJ are based on substantial evidence in the record as a whole. For example, plaintiff herself indicated in July, 2006 that she gets along fine with authority figures (AR. 184), noting on one function report from October, 2007 that she gets along with authority figures "very well!" (AR. 227). On

this October, 2007 function report, plaintiff further indicated that she does "have social skills" (*id*.). Similarly, plaintiff did not indicate any problems regarding social interactions when shopping or going to church, and noted that she converses with others on the phone (*see* AR. 22, 1294 ("I talk to people")). Plaintiff testified that she has "like four" best friends to whom she speaks on the phone, "sometimes they talk to me for like an hour, sometimes they talk to me 10 minutes, five minutes" (AR. 1296). Plaintiff reported to Dr. Shawn Kenderdine, PhD, that she "maintains relationships with several friends and her [best friend]" (AR. 2444). The Court also notes that the ALJ supported the failure to credit fully plaintiff's allegations regarding social limitations by noting that when plaintiff was asked about spending time with others, she "reported that she was a 'comfort provider' for friends and family, as everyone opened up to her (AR. 1205 (citing AR. 223)). The ALJ also noted that on August 4, 2006, plaintiff "reported that she had recently been in a bar and had attempted to break up a fight between two drunk girls" (AR. 1204 (citing AR. 1653)). This finding is based on substantial evidence in the record as a whole and supports the ALJ's inference that this "report shows that the claimant is capable of being around others, as she would be in the workplace, as she tolerated exposure even to intoxicated fellow patrons in a bar setting" (*id*.).

The Court also concludes that the findings by the ALJ adequately support the ALJ's finding that plaintiff has only moderate limitations with respect to social functioning.

With respect to activities of daily living, the ALJ included the following discussion:

In activities of daily living, the claimant has moderate restriction. In her function report, the claimant reported that during the day she showered, made meals, and did laundry, although asserting limitations due to pain. She reported that she cared for her husband when he was very ill, by making him soup and giving him fluids and medications. She reported that she fed her five children but claims that they were fairly self-sufficient. She also fed and watered the cats. The claimant denied that she needed special reminders to attend her personal needs/grooming or to take her medications. She reported that she cooked simple meals regularly. She shopped in stores usually with help, she drove, and was able to handle money. (Internal citation to AR. 175-85). Her hobbies/interests were reading magazines, watching television, listening to music, activities she did 'most days.' (Internal citation to AR. 182). In October 2014, the claimant testified that on a typical day she would take her medications and stretch, take a bath, have coffee, talk to a friend, watch television, talk to people and 'basically read a lot.' (Internal citation to AR. 1294). She cooked dinner 3 to 4 times per week usually. Most days she would load the dishwasher and wipe off counters. Occasionally she would use the hand vacuum and put things away. She went shopping with her boyfriend, drove, and traveled once a year to see her kids in Oklahoma by car or plane. These examples and the medical evidence of record as a whole as discussed in this decision, establish no more than moderate limitation in this domain of functioning.

(AR. 1171).

The Court concludes that the ALJ's findings with respect activities of daily living are based on substantial evidence in the record as a whole. For example, as noted by the ALJ, plaintiff testified that her daily activities include stretching, taking a bath, having her coffee, talking to her friend while she does the dishes, watching TV, talking to people on the phone and reading "a lot" (AR. 1294). She also testified that she usually cooks dinner, three or four times a week (AR. 1294-95). Plaintiff testified that she goes to the grocery store usually once a week, and that once or twice a month she "might visit a friend for two hours if I have to come to Tacoma" (AR. 1295). Regarding chores, plaintiff testified she loads dishwasher, wipes off the counter, makes sure that the counter

in the bathroom is wiped off, puts things away where they belong and occasionally she will use the hand vacuum (AR. 1294). Also as noted by the ALJ, plaintiff testified that once a year she travels to Oklahoma to see her children (AR. 1292). In her function report, as noted by the ALJ, plaintiff reported that she showers, makes a bowl of cereal or sandwich on most days, starts a little laundry, and goes to "many" doctor appointments (AR. 178). Plaintiff also indicated that she makes soup and gets her boyfriend fluids and medications when he is very ill, and feeds and spends time with her children, as well as feeding and providing water for her cats (AR. 179). Plaintiff indicated that she does not need any special reminders to take care of her personal needs/grooming or to take her medications (AR. 180). Also as noted by the ALJ, plaintiff indicated that she prepares her own meals regularly, noting that she makes extra to put in the freezer for another meal (*id*.). She indicated that when her kids are home, she makes dinner each day (*id*.). As noted by the ALJ, plaintiff indicated that she goes outside every couple of days, either for an appointment with her doctor or to get groceries; indicated that she drives; indicated that she can go out alone except when her pain is bad; and indicated that she can handle money (AR. 181). Plaintiff indicated that her hobbies included reading magazines, watching TV, and listening to music, activities which she reported doing "most days" (AR. 182). Plaintiff reported to Dr. Shawn Kenderdine, PhD, that she "is capable of performing her ADLs . . . ." (AR. 2444).

The Court concludes that the ALJ's finding that plaintiff has only moderate restriction and her activities of daily living is a finding based on substantial evidence in the record as a whole. Although plaintiff points to her testimony and allegations, and her

behavior at her hearing, in support of her argument that she suffers from marked

limitations in various areas, as will be discussed below, the Court concludes that the ALJ

appropriately failed to credit fully plaintiff's allegations and testimony, *see infra*, section

3. In addition, plaintiff offers at most an alternative view of the record. It is not the job of

the court to reweigh the evidence: If the evidence "is susceptible to more than one

rational interpretation," including one that supports the decision of the Commissioner, the

Commissioner's conclusion "must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954

(9th Cir. 2002) (citing *Morgan, supra,* 169 F.3d at 599, 601).

        For these stated reasons and based on the record as a whole, the Court concludes

that the ALJ did not err when failing to find that plaintiff's impairments meets or

medically equal a Listed Impairment. Even if the ALJ erred by failing to conclude that

plaintiff suffers from marked difficulties in concentration, persistence and pace, which

the Court does not, there still would be no harmful error, as in order for mental

impairments to meet or medically equal the criteria of a Listed Impairment, the mental

impairments must result in at least two areas of marked restriction, or one area of marked

restriction along with repeated episodes of decompensation, each of extended duration.

Plaintiff does not attempt to argue that she suffers from repeated episodes of

decompensation of extended duration, and the Court notes that the ALJ's finding that the

"record contains insufficient evidence of any episodes of decompensation of extended

duration" is a finding based on substantial evidence in the record as a whole (AR. 1172).

With respect to the ALJ's finding regarding concentration, persistence, or pace, the Court

notes that the ALJ's finding that plaintiff regularly demonstrated adequate concentration,

and that an examining doctor opined that during the course of the fast-paced psychiatric interview plaintiff "demonstrated good concentration, persistence, and pace throughout" are findings based on substantial evidence in the record as a whole (AR. 352, 1171-72; *see also* AR. 491 (Dr. Borisovskaya opined that plaintiff's "concentration, persistence, and pace were within normal limits throughout the examination"), 2738 (Plaintiff reported having a 3.0 grade point average)).

The Court finds no harmful error in the ALJ's failure to find that plaintiff's impairments meet or medically equal any of the Listed Impairments.

**(3)    Did the Commissioner err in evaluating plaintiff's testimony and allegations?**

Plaintiff contends that the ALJ erred by failing to credit fully plaintiff's allegations and testimony (Dkt. 17, pp. 9-12). Defendant responds that the ALJ committed no harmful legal error (Dkt. 18, pp. 8-12).

If an ALJ rejects the testimony of a claimant once an underlying impairment has been established, the ALJ must support the rejection "by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir.1993)); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) ("There is no conflict in the caselaw, and we reject the government's argument that *Bunnell* excised the "clear and convincing" requirement"); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citing *Bunnell v. Sullivan*, *supra*, 947 F.2d at 343, 346-47). As with all of the findings by the ALJ, the specific, clear and convincing reasons also must be supported by substantial evidence in

the record as a whole. 42 U.S.C. § 405(g); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)).

If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and analyzing a claimant's testimony regarding limitations lies with the ALJ. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (citing *Waters v. Gardner*, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*Calhoun v. Bailar*, 626 F.2d 145, 150 (9th Cir. 1980)). An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citing 42 U.S.C. § 423(d)(5)(A) (other citations and footnote omitted)). Even if a claimant "has an ailment reasonably expected to produce *some* pain; many medical conditions produce pain not severe enough to preclude gainful employment." *Fair, supra*, 885 F.2d at 603.

First, the Court notes that the ALJ's thorough discussion of the medical record reveals a plethora of issues with plaintiff's testimony, backed by a substantial amount of evidence (AR. 1174-1200). For example, as noted by the ALJ, on February 28, 2006, "plaintiff denied drug use and reported only rare alcohol use once a month," however, at the time, it was "noted that the claimant 'smelled of liquor when she walked out of the bathroom prior to being seen,' and on April 5, 2006, plaintiff "reported that she had been addicted to OxyContin the past" (AR. 1176, 1177 (citing AR. 2255, 2256, 1691)).

Similarly, on March 15, 2006, plaintiff denied street drug use, however her toxicology screen was, for the second time, positive for THC, and also was positive for PCP (AR. 313, 323). The day prior, plaintiff claimed she had been drugged with PCP at a

party (AR. 2680). However, as noted by the ALJ, when plaintiff subsequently testified under oath, she stated that during the time of the March, 2006 incident, she did not even know what PCP was (AR. 48 ("I looked at them and said, what is PCP? And I didn't know what they were talking about")). On July 17, 2006, plaintiff's urine drug screen was again positive for THC and PCP (AR. 1179). In December, 2008, Dr. Rodrigo Mariano, M.D., noted that he was informed by "Dr. Joyce from labs [] that [the] PCP test is very specific and that no other drug could cause it to be positive on the drug screen" (AR. 1907). Dr. Mariano opined that he "STRONGLY BELIEVED THAT THIS PATIENT [is] USING PCP" (*id*.). Dr. Mariano explained to plaintiff that with three drug screens done in one month, and two out of the three positive for PCP, although the first drug screen could have been a false positive, he did "not have any explanation on the third drug screen other than thinking that she is using PCP, [noting that] SHE NEEDED DRUG REHAB, [but that] she got offended and decided to walk out of the room" (*id*.). The ALJ's finding that plaintiff's "use of illicit substances may explain her erratic, tangential, and hysterical presentations" is based on substantial evidence and is properly considered as it is relevant to determination of which of plaintiff's potential limitations actually result from impairments[1] (AR. 1207).

---

[1] The Court is aware of a recent Social Security Ruling in which the Administration clarified that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3P, 2016 WL 111-9029, 2016 SSR LEXIS 4 at *1 (effective March 16, 2016). The ruling indicates that when evaluating a claimant's symptoms, ALJs "will not assess an claimant's overall character or truthfulness in the manner typically used during an adversarial court litigation." *Id.* at 27. Although this SSR is not binding on the ALJ in the matter herein due to its effective date, even under this new SSR, the findings noted herein are relevant for multiple reasons, including that the ALJ's inference that plaintiff presented with pain complaints seeking narcotics as noted by various treatment providers and the ALJ's finding that

The ALJ also noted plaintiff's call to the Social Security field office on September 20, 2007, where plaintiff "spoke quickly and it was impossible to interject anything [and] she finally admitted that she had taken Adderall that she had found 'lying around' and how much better she felt" (AR. 1184 (quoting AR. 234)). Shortly thereafter, plaintiff called the Social Security office again in order to fill out her activities of daily living form, and "thought that [the Social Security employee] should tell [] claimants that are having her same problems to try Adderall since it works GREAT" (AR. 234). Approximately 4 ½ hours later, plaintiff called the Social Security field office again and stated that "she is not taking Adderall, 'she woke up and smelled the coffee'" (*id*.). As noted by the ALJ, less than two weeks later, plaintiff saw a treatment provider, and requested a 'refill' of Adderall, claiming that it had been prescribed at a civilian facility the previous month and that she felt better on medication" (AR. 1184 (quoting AR. 2046)). At this October 1, 2007 appointment, plaintiff's upper extremities strength was reduced, but it was noted to be "effort related" (AR. 2047).

On October 10, 2007, as noted by the ALJ, plaintiff presented to the urgent care clinic in a wheelchair, claiming that she was too weak to walk (AR. 1185, 2044). However, the doctor noted that he and his nurse had seen her "stand up and walk around the room" (AR. 2044).

---

plaintiff's "use of illicit substances may explain her erratic, tangential, and hysterical presentations" are based on substantial evidence and are properly considered as they are relevant to the determination of which of plaintiff's potential limitations actually result from impairments (AR. 1207).

As noted by the ALJ, on February 11, 2008, plaintiff reported to a therapist at Madigan AMC-Fort Lewis that she was "going through withdraw from OxyContin," and that she was unhappy about being taken off of OxyContin abruptly, complaining that no one was treating her fairly, noting that St. Clair's hospital "did not want to give her the meds she was seeking either" (AR. 1186, 2002). However, two days later, plaintiff stated "that she discontinued her OxyContin and Percocet last month after her medications were stolen" (AR. 1998).

On August 31, 2008, as noted by the ALJ, plaintiff went to the emergency room "by ambulance, complaining of nausea and all over body pain" (AR. 1187). Dr. Robert Jensen, M.D., noted that plaintiff had "a history of drug-seeking behavior" (AR. 536). He noted that plaintiff "came in just screaming loudly, writhing all over" (*id*.). Dr. Jensen noted that plaintiff refused to let the nurse draw any blood until she received pain medication, but after the doctor explained that they "would not give her any pain medication until after she allowed the blood draws," plaintiff allowed the blood draws (*id*.). Dr. Jensen notes in the treatment record that they requested a urine sample and plaintiff "went into the bathroom and filled the urine cup up with tap water" (*id*.). When Dr. Jensen discussed this with plaintiff, she "refused to give us a urine sample" (*id*.). Dr. Jensen noted that after plaintiff "received initial medications, she calmed down very much and also was doing what was described by nursing staff as ballerina stretching in the room, showing absolutely no signs of back or neck pain and appearing extremely limber and mobile" (*id*.). Dr. Jensen opined that plaintiff "was very histrionic and appeared very much to be narcotic seeking" (*id*.).

On October 20, 2008, as noted by the ALJ, plaintiff went to Okmulgee Hospital requesting pain medication (AR. 1188, 1889). The ER record documents that when plaintiff was called from the lobby, she was not in the waiting area and later told the nurse that she had been in the bathroom vomiting (AR. 1889). However, someone in the lobby reported that she actually had been observed outside smoking (*id*.). When informed that she would not receive any pain medications but that they would treat her nausea, plaintiff refused to sign an "against medical advice" form and left angry (AR. 1888).

When failing to credit fully plaintiff's allegations and testimony, the ALJ explicitly relied on a finding that the medical evidence "establishes significant inconsistencies and exaggerations with regard to symptoms, functioning, and other issues" (AR. 1200). The ALJ provided a specific example, noting that in January 2005, "Dr. Ploss concluded that 'nothing in the history or physical exam fit with the degree of pain and disability' that the claimant reported" (*id.* (citing AR. 279)). The Court already has discussed some of the medical record reviewed by the ALJ above, *see supra*. The medical evidence in this discussion reveals numerous inconsistencies between plaintiff's allegations of limitations and her actual functional ability, as well as evidence supporting the ALJ's finding that plaintiff exaggerated her limitations and pain to her treatment providers. Noted throughout this Order are various references by the ALJ to the treatment record demonstrating notations from treatment providers of "a history of drug seeking behavior" (AR. 1201 (citing AR. 536)). The ALJ's failure to credit fully plaintiff's "claims of pain and resulting functional restrictions," in part based on these notations

throughout the record supports the ALJ's failure to credit fully her allegations and is supported by substantial evidence in the record as a whole.

Further supporting the finding by the ALJ of an inconsistency between plaintiff's allegations and her demonstrated ability, plaintiff testified that she has problems remembering things "all the time" (AR. 1293). However, as evidenced by the ALJ's thorough discussion of the medical evidence, numerous times during mental status examinations ("MSEs") plaintiff demonstrated normal memory (*see* AR. 1174-1200; *see also* AR. 350 (October 19, 2006, plaintiff scored 3/3 on one minute recall; 3/3 on five minute recall; and "demonstrated good ability to recall past memories"), 490-91 (immediate memory and past memory were "good," and on a test of recent memory, plaintiff recalled 2/3 objects in five minutes, but recalled all three with a prompt), 2256-57 (concentration, memory and cognition appeared normal)).

Similarly, although plaintiff presented to the ER at St. Joseph asserting that she was bleeding from her esophagus due to vomiting from severe pain, there was no evidence of esophageal bleeding (AR. 1187 (citing AR. 635-38)). This supports the ALJ's finding that plaintiff's allegations are not supported by the objective medical evidence. Despite plaintiff's regular reports of ongoing back pain, plaintiff presented to Dr. Debra Webb, D.O., on December 18, 2008 complaining of sores in her mouth and requesting refills for oxycodone and Klonopin, reporting that her meds were stolen (AR. 1937). Despite complaints of persistent back pain both before and after this appointment, at this appointment she denied any symptoms other than the sores in her mouth, specifically denying any neck, pulmonary, musculoskeletal, neuro, or physiological

symptoms (*id.*). Her examination at this appointment revealed a normal musculoskeletal exam and normal movement of all extremities, and no abnormalities in the bilateral fingers, hands, wrists, elbows, shoulders, hips, knees, ankles, or feet (AR. 1937-38). Despite plaintiff's denial of any musculoskeletal symptoms on December 18, 2008, plaintiff subsequently reported to Dr. Arthur Ginsberg, M.D., that she had weakness and pain in the lower extremities since 1993 (AR. 2403). Plaintiff's report of weakness was not supported by his examination, which revealed that the "glutei, the hamstrings, quadriceps, tibialis anterior muscles, and gastrocs appear in full strength at MRC 5/5" (AR. 2404). Dr. Ginsberg noted that there was no evidence of atrophy (*id.*).

On June 3, 2011, plaintiff rated her functional activity level at eight out of ten with her medications, with ten being highest level of activity (AR. 2472). Similarly, on August 22, 2011, as noted by the ALJ, plaintiff "admitted that her pain medications improved her ability to function adequately overall and specifically improved or walking ability, her ability to work or perform household chores, her ability to interact socially with other people, and her ability to sleep and overall enjoyment of life" (AR. 1193, 1799). On November 28, 2011, plaintiff rated her functional activity level with medications at ten out of ten (AR. 2630), which is also the level of her reported functional activity on January 23, 2012 (AR. 2621); and on February 17, 2012 (AR. 2617). Plaintiff's reports of the highest level of functional ability multiple times clearly is inconsistent with her allegations of disabling limitations.

On February 21, 2012, despite plaintiff's report to her doctor that "she has been told by providers in the past that 'she has the spine of a seven-year-old,'" Dr. Lundin

1   opined that, "based on the radiographic images of the last 12 months, this proves to be

2   untrue," further opining that her mild disc disease was "not outside of the proportion of a

3   normal healthy individual her age, especially given the activities that she did in the past"

4   (AR. 2607). Similarly, on May 10, 2013, despite presenting with "a huge number of

5   problems," on exam, Dr. Layton E Jump, M.D., noted a "pain scale mismatch,"

6   explaining that plaintiff demonstrated no pain behavior, no acute distress and was

7   "vigorous" (AR. 2837-38). Regarding plaintiff's fibromyalgia, Dr. Jump noted that there

8   were no fibromyalgia trigger points (AR. 2838).

9

10       On May 29, 2014, plaintiff visited Dr. Jump in order to get papers signed for loan

11   forgiveness "for pain and orthopedic reasons" (AR. 2779). Regarding his examination,

12   Dr. Jumped noted that there was no "focal neurologic abnormality" (AR. 2781). He also

13   noted that plaintiff "moves around the room very quickly, has many rapid motions, bends

14   quickly to pick up papers that have fallen on the floor, twisted rapidly and bends quickly

15   to try and stop a large stack of papers falling off the counter, [further noting that] there is

16   no pain behavior, no guarding, no hesitancy" (*id*.).

17       Based on the record as a whole, the Court concludes that the ALJ's finding that

18   there are significant inconsistencies between plaintiff's allegations regarding her

19   limitations and the medical record and that plaintiff regularly demonstrated exaggerations

20   when presenting her complaints to treatment providers are findings based on substantial

21   evidence in the record as a whole. There is a large amount of evidence for these particular

22   findings by the ALJ.

23

24

1    Not only did the ALJ find that plaintiff's allegations are inconsistent with the

2  medical evidence, but also, the ALJ found that she provided inconsistent statements to

3  her medical providers, specifically about the effects of medications (*see* AR. 1206). As

4  noted by the ALJ, on April 28, 2010, plaintiff "claimed that Lyrica had caused her to gain

5  30 pounds and did not make her feel much better" (*id.* (citing AR. 1036), but on February

6  21, 2012, plaintiff "told Dr. Lundin that Lyrica had helped significantly, but was not

7  covered by her current health plan" (*id.* (citing AR. 2664). The ALJ also noted that "after

8  initially denying that she had ever been fired from a job in her first function report, the

9  claimant reported that she had been fired from a job because of problems getting along

10  with others in her youth, specifically a job at Sears doing telemarketing" (AR. 1206

11  (citing AR. 184, 227)). The Court has reviewed the treatment record and concludes that

12  these findings by the ALJ are supported by substantial evidence in the record as a whole

13  and demonstrate that plaintiff repeatedly provided inconsistent reports (*see* AR. 184, 227,

14  1036, 2664). Furthermore, the Court concludes that this rationale further buttresses the

15  ALJ's decision not to credit fully plaintiff's allegations of her symptoms and limitations.

16    From the ALJ's discussion of the decision not to credit fully plaintiff's allegations,

17  it is clear that the ALJ also failed to credit fully plaintiff's allegations based on her failure

18  to follow treatment recommendations. For example, as noted by the ALJ on "February

19  25, 2014, Ms. Carlson noted that medication reconciliation per pharmacy records showed

20  that [plaintiff] had not been filling all the medication on the list regularly, even though

21  she claimed that she was taking all of them" (AR. 1199 (citing AR. 2800)). Similarly, as

22  noted by the ALJ, on October 5, 2014, plaintiff "was discharged from BHR, as she had

not returned after the September 2013 appointment, [and] [plaintiff's] therapist noted that she had showed for only a couple of individual sessions" (AR. 1200 (citing AR. 2887)). The Court concludes that the ALJ's implicit finding that plaintiff failed to follow prescribed treatment is a finding based on substantial evidence in the record as a whole and provides further rationale for the ALJ's failure to credit fully plaintiff's allegations and testimony. *See* 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled").

For the reasons stated, Court concludes that the ALJ provided very clear and convincing reasons based on substantial evidence in the record as a whole for her failure to credit fully plaintiff's allegations and testimony.

**(4)    Did the Commissioner err in determining plaintiff's residual functional capacity ("RFC")?**

Although plaintiff listed this as an issue in her opening brief, she eliminated this issue when filing her reply brief (*see* Dkt. 19, p. 2). Furthermore, plaintiff's arguments in her opening brief regarding her RFC are not persuasive. Despite alleging that she could not interact with coworkers or supervisors, the Court already has discussed the record regarding the ALJ's finding with respect to plaintiff's social limitations, including plaintiff's own report that she is a "comfort provider" for her friends and family members and her report that she gets along with authority figures "very well!", *see supra* (*see also* AR. 223, 227). Similarly, although plaintiff contends that her difficulty concentrating would prevent her performing even simple tasks, plaintiff repeatedly performed a simple tasks during her MSEs and the Court has noted already that an examining doctor opined

that during the course of the fast-paced psychiatric interview plaintiff "demonstrated good concentration, persistence, and pace throughout" (AR. 352; *see also* AR. 491 (Dr. Borisovskaya opined that plaintiff's "concentration, persistence, and pace were within normal limits throughout the examination")). Plaintiff's other allegations regarding limitations that should have been included in the RFC rely solely on plaintiff's testimony, and the Court already has upheld the ALJ's failure to credit fully plaintiff's allegations and testimony, *see supra*, section 3. The Court finds no harmful legal error in ALJ's determination regarding plaintiff's RFC.

**(5)      Did the Commissioner err in dismissing the testimony of the vocational expert?**

Although plaintiff listed this as an issue in her opening brief, she eliminated this issue when filing her reply brief (*see* Dkt. 19, p. 2). Furthermore, plaintiff provides no credible evidence that she would be off task 20 percent of the workday or workweek. The Court finds no error.

**(6)      Did the Commissioner err by relying on insufficient medical evidence?**

Although plaintiff listed this as an issue in her opening brief, she eliminated this issue when filing her reply brief (*see* Dkt. 19, p. 2). Furthermore, plaintiff provides no new discussion or argument regarding this issue even in her opening brief. As discussed throughout this Order, the Court concludes that the ALJ's findings regarding plaintiff's RFC and regarding the medical evidence are based on substantial evidence in the record as a whole. The Court finds no error.

<u>CONCLUSION</u>

The ALJ offered very clear and convincing rationale for failing to credit fully plaintiff's allegations and testimony that are supported by substantial evidence in the record as a whole. Plaintiff's inconsistent statements are many and varied. Furthermore, the objective medical evidence, as well as the medical opinions in the record, as discussed by the ALJ, fully support the ALJ's RFC determinations as well as her ultimate conclusion regarding disability.

Based on these reasons and the relevant record, the Court **ORDERS** that this matter be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

**JUDGMENT** should be for defendant and the case should be closed.

Dated this 16th day of December, 2016.

J. Richard Creatura
United States Magistrate Judge